Jason Crews
1515 N Gilbert Rd Ste 107-204
Gilbert, AZ 85234
602-295-1875
Jason.crews@gmail.com

*In propria persona.*

FILED ___ LODGED
___ RECEIVED ___ COPY

JAN 0 6 2025

CLERK U S DISTRICT COURT
DISTRICT OF ARIZONA
BY_____ DEPUTY

UNITED STATES DISTRICT COURT

FOR THE DISTRICT ARIZONA

PHOENIX DIVISION

| | |
|---|---|
| Jason Crews,<br><br>Plaintiff,<br><br>vs.<br><br>Blackrock Debt Relief Corp,<br>and<br>Artur Aminov<br><br>Defendants. | Case No.: **CV25-00025-PHX-JAT**<br><br>Complaint for Violations of:<br>1.   NEGLIGENT VIOLATIONS OF THE TELEPHONE CONSUMER PROTECTION ACT [47 U.S.C. §227 ET SEQ.]<br>2.   WILLFUL VIOLATIONS OF THE TELEPHONE CONSUMER PROTECTION ACT [47 U.S.C. §227 ET SEQ.]<br><br>DEMAND FOR JURY TRIAL |

///

COMPLAINT- 1

# COMPLAINT

## Preliminary Statement

1. "When it comes to robocalls, you can only call those who, like Blondie, have said, "Call me. Call me on the line." If you call people who haven't opted in , then you face liability under the Telephone Communications Protection Act." *Perrong v. Bradford*, 2024 WL 2133801, at *1 (E.D. Pa. May 13, 2024).

2. Plaintiff Jason Crews ("Plaintiff") brings this action under the Telephone Consumer Protection Act ("TCPA"), 47 U.S.C § 227, a federal statute enacted in response to widespread public outrage about the proliferation of intrusive, nuisance calling practices. See *Mims v. Arrow Fin. Servs., LLC*, 132 S. Ct. 740, 745 (2012).

3. The Defendants in this action Blackrock Debt Relief Corp and Artur Aminov orchestrated placing at least one (1) illegal telemarketing call using an Automated Telephone Dialing System ("ATDS") to a number assigned to a cellular service which included an automated or pre-recorded voice.

4. Plaintiff never consented to receive such messages.

## Parties

5. Plaintiff Jason Crews ("Crews") is and was a resident of Maricopa County, Arizona at all relevant times, and a resident of this District.

6. Defendant Blackrock Debt Relief Corp ("Blackrock"), incorporated in New York and is in the business of debt negotiation and resolution.

7. Defendant Artur Aminov ("Aminov"), a resident of Queens County, New York, was at all times relevant the owner and manager of Blackrock who directed and authorized the illegal calls complained of herein.

## Jurisdiction & Venue

8. The Court has federal question subject matter jurisdiction over these TCPA claims: *Mims v. Arrow Fin. Services, LLC*, 132 S. Ct. 740 (2012).

9. The Court has specific personal jurisdiction over the Defendants because the defendants caused the events complained herein to occur in Arizona out of which the TCPA claims arose, and

COMPLAINT- 2

the defendants had minimum contacts with Arizona to justify assertion by an Arizona court of personal jurisdiction, *Meyers v. Hamilton Corp.*, 693 P.2d 904 (Ariz. 1985). Defendants intentionally called or caused Plaintiff's number to be called by dialing an Arizona area code at least one (1) time within a twelve month period to advertise their services.

10. This Court has specific personal jurisdiction over Defendants because Defendants purposefully availed themselves to the State of Arizona and to this District, and there is a sufficient relationship between Defendants' purposeful contacts with Arizona and the litigation. Defendants purposefully sent calls into Arizona despite having no business relationship with Plaintiff.

   a. Defendants target Arizona when marketing debt relief and regularly conduct business in this District, including telephone solicitation.

   b. Defendants purposefully sent phone calls to Plaintiff's Phoenix area phone number with area code 602 to generate leads for Defendant Blackrock.

   c. Defendant Aminov directed the calls to be sent into Arizona and purposefully directed that Arizona residents be targeted with the solicitation phone calls.

   d. The purposeful calls to Arizona injured Plaintiff in Arizona, creating a causal link among Defendants, the forum, and the litigation exceeding the non-causal affiliation sufficient to support personal specific jurisdiction. See *Ford Motor Co. v Mont. Eight Jud. Dist. Ct.*, 141 S. Ct. 1017 (2021).

## Venue

11. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(1)-(2) because a substantial part of the events giving rise to the claims—the calls and sale of goods and services directed at Texas residents, including the Plaintiff—occurred in this District and because the Plaintiff resides in this District and because the Plaintiff resides in the District of Arizona when he received a substantial, if not every single phone call, from Defendants Blackwater and Aminov which is the subject matter of this lawsuit.

12. Venue is proper for this matter because the calls at issue were sent by or on behalf of the above-named Defendants to Plaintiff, an Arizona resident.

///

COMPLAINT- 3

## The Telephone Consumer Protection Act

13. In 1991, Congress enacted the TCPA to restrict the use of sophisticated telemarketing equipment that could target millions of consumers en masse. Congress found that these calls were not only a nuisance and an invasion of privacy to consumers specifically but were also a threat to interstate commerce generally. See S. Rep. No. 102-178, at 2-3 (1991), as reprinted in 1991 U.S.C.C.A.N. 1968, 1969-71.

14. The TCPA makes it unlawful "to make any call (other than a call made for emergency purposes or made with the prior express consent of the called party) using an automatic telephone dialing system ('ATDS") or an artificial or prerecorded voice ... to any telephone number assigned to a ... cellular telephone service." 47 U.S.C. § 227(b)(1)(A)(iii).

15. The TCPA makes it unlawful "to initiate any telephone call to any residential telephone line using an artificial or prerecorded voice to deliver a message without the prior express consent of the called party, unless the call is initiated for emergency purposes, is made solely pursuant to the collection of a debt owed to or guaranteed by the United States or is exempted by rule or order" of the Federal Communication Commission ("FCC"). 47 U.S.C. § 227(b)(1)(B). 15. The TCPA provides a private cause of action to persons who receive calls in violation of § 227(b). 47 U.S.C. § 227(b)(3).

16. Separately, the TCPA bans telemarketing calls without a do-not-call policy

17. available upon demand. 47 U.S.C. § 227(c); 47 C.F.R. § 64.1200(d)(1).1

18. The TCPA provides a private cause of action to persons who receive calls in violation of § 227(c) or a regulation promulgated thereunder. 47 U.S.C. § 227(c)(5).

19. According to findings of the FCC, the agency vested by Congress with authority to issue regulations implementing the TCPA, automated or prerecorded telephone calls are a greater nuisance and invasion of privacy than live solicitation calls and can be costly and inconvenient.

20. The FCC also recognizes that "wireless customers are charged for incoming calls whether they pay in advance or after the minutes are used." *In re Rules and Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 18 FCC Rcd. 14014, 14115 ¶ 165 (2003).

COMPLAINT- 4

21. The FCC requires "prior express written consent" for all autodialed or prerecorded telemarketing robocalls to wireless numbers and residential lines. In particular:[A] consumer's written consent to receive telemarketing robocalls must be signed and be sufficient to show that the consumer: (1) received clear and conspicuous disclosure of the consequences of providing the requested consent, i.e., that the consumer will receive future calls that deliver prerecorded messages by or on behalf of a specific seller; and (2) having received this information, agrees unambiguously to receive such calls at a telephone number the consumer designates. In addition, the written agreement must be obtained without requiring, directly or indirectly, that the agreement be executed as a condition of purchasing any good or service.

22. *In the Matter of Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 27 FCC Rcd. 1830, 1844 ¶ 33 (2012) (footnote and internal quotation marks omitted). FCC regulations "generally establish that the party on whose behalf a solicitation is made bears ultimate responsibility for any violations." *In the Matter of Rules and Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 10 FCC Rcd. 12391, 12397 ¶ 13 (1995).

23. The FCC confirmed this principle in 2013, when it explained that "a seller ... may be held vicariously liable under federal common law principles of agency for violations of either section 227(b) or section 227(c) that are committed by third-party telemarketers." *In the Matter of the Joint Petition Filed by Dish Network, LLC*, 28 FCC Rcd. 6574, 6574 ¶ 1 (2013).

24. Under the TCPA, a text message is a call. *Satterfield v. Simon & Schuster, Inc.*, 569 F.3d 946, 951 – 52 (9th Cir. 2009).

25. A corporate officer involved in the telemarketing at issue may be personally liable under the TCPA. E.g., *Jackson Five Star Catering, Inc. v. Beason*, Case No. 10-10010, 2013 U.S. Dist. LEXIS 159985, at *10 (E.D. Mich. Nov. 8, 2013) ("[M]any courts have held that corporate actors can be individually liable for violating the TCPA where they had direct, personal participation in or personally authorized the conduct found to have violated the statute." (internal quotation marks omitted)); *Maryland v. Universal Elections*, 787 F. Supp. 2d 408, 415 – 16 (D. Md. 2011) ("If an individual acting on behalf of a corporation could avoid individual liability, the TCPA would lose much of its force.").

COMPLAINT- 5

## Factual Allegations

26. To promote their services Defendants relied on prerecorded "robocalls."

27. To promote their services Defendants also relied on the use of ATDS systems.

28. Plaintiff had no prior business relationship with Defendants.

29. Plaintiff is a "person" as defined by 47 U.S.C. § 153(39).

30. Defendant Aminov is a "person" as defined by 47 U.S.C. § 153(39).

31. The phone number (602)642- XXXX ("Cell Number") belongs to Plaintiff.

32. Despite this registration, Defendants placed the calls summarized in the following table with an Automated Telephone Dialing Systems ("ATDS").

| Date | Time | Caller ID |
|---|---|---|
| 11/19/24 | 12:56 PM | (517)582-2405 |

33. The Cell Number is assigned to a cellular phone used exclusively for personal residential purposes.

34. Plaintiff did not consent to receive prerecorded or automated messages to his Cell Number.

35. Plaintiff did not consent to receive telephone calls via ATDS.

36. The Cell Number is not associated with a business.

Calls to Plaintiff

37. On or about November 11, 2024, at 12:56 pm, Plaintiff received a call presenting caller ID (571)582-2405.

38. Plaintiff was played by a pre-recorded message identifying "Credit Relief Solutions".

39. This prerecorded message advertised "$26,000 emergency relief fund … This fund can be utilized for any purpose, such as personal needs, settling existing balances, or unexpected expenses … [and] The enrollment period expires today."

40. Plaintiff was then transferred to an individual who identified themselves as Nika from the "Hardship Debt Relief Program".

COMPLAINT- 6

41. Nika asked Plaintiff several "qualifying questions", and if he could "commit to monthly payments."

42. Plaintiff was then transferred to Kelly from Blackrock Debt Releif.

43. Nika introduced Plaintiff to Kelly directly stating Plaintiff would like to learn more about "your program".

44. Plaintiff asked for some basic identifying information, and the call was disconnected.

45. On December 19, 2024, Plaintiff emailed Blackrock at info@blackrockdebtrelief.com, requested to be placed on their internal do-not-call-list, and requested a copy of their internal do-not-call policy.

46. Plaintiff was never sent a copy of the policy.

47. Plaintiff believes and theirfor avers this is because no such policy exists.

## Defendants' Use of an ATDS

48. Blackrock's initiated the call with an automated message with no apparent intervention of a human.

49. Multiple Blackrock's representatives purposefully attempted to conceal the identity of their company, disconnecting the call when Plaintiff inquired about their identity.

50. Blackrock's representatives solicited services did not target Plaintiff individually or any individual, rather presenting an "important message".

51. For these reasons, Plaintiff believes the telemarketers used an ATDS to generate leads for Defendant's debt relief services.

52. The calls were conducted using an Automatic Telephone Dialing System (ATDS). As the Supreme Court recently clarified, the key feature of an ATDS is the capacity to store numbers to be called using a random or sequential number generator or to produce numbers to be called using a random or sequential number generator: *Facebook, Inc. v. Duguid*, 141 S. Ct. 1163, 1167 (2021).

53. The Third Circuit recently clarified that "Congress envisioned a broad understanding of 'equipment'" that constitutes an ATDS. It also clarified that the analysis of whether an ATDS was used in violation of the TCPA centers around "whether the Defendants employ[s] [ATDS]

COMPLAINT- 7

capacities to make automated calls": *Panzarella v. Navient Sols., Inc.*, 37 F.4th 867, 873, 878 (3d Cir. 2022). In so doing, it held that Congress intended to "ban all autodialed calls" because Congress "found autodialer technology to be uniquely harmful": Id. at 879 (cleaned up).

54. In enacting the ATDS prohibition, the Third Circuit cited favorably to Congressional understanding "that telemarketers could transform ordinary computers into autodialers through minor and inexpensive modifications," including by "relying on computerized databases containing telephone numbers during their dialing campaigns": Id. at 880 (cleaned up). The Third Circuit held that, in passing the TCPA's ATDS prohibition, Congress intended to remedy the problems caused by callers using computer software to dial numbers randomly or sequentially from a list or database: *Id.*

55. The system(s) that Defendants used to place the calls to Plaintiff is/are an ATDS because it would be illogical to dial a number manually, have Plaintiff answer the phone, and only then connect Plaintiff to a human being.

56. Audible pauses, clicks, and beeps are hallmark indicia of ATDS systems. This supports the inference that Defendants used an ATDS, such as one that "use[s] a random [or sequential] number generator to determine the order in which to pick phone numbers from a pre-produced list": *Facebook*, 141 S. Ct. at 1171 n.7.

57. Other courts have held, post-Facebook, that allegations similar to those herein of the absence of a relationship between the parties, and the random nature of the automation device (such as the ability to randomly generate caller ID numbers), are all indicia of use of a random or sequential dialing device. This gives rise to the inference at the pleadings stage that an ATDS was used to make the calls: *Camunas v. Nat'l Republican Senatorial Comm.*, No. 21-1005, 2021 U.S. Dist. LEXIS 100125 at *11 (E.D. Pa. May 26, 2021).

58. No facts exist here to support the conclusion that Defendants was calling from a curated list of his past customers. In contrast to a company that dials calls en masse to multiple individuals from a list of telephone numbers (as here), a company that calls its existing customers utilizing an imported customer list does not place calls using an ATDS. Such calling uses a database

COMPLAINT- 8

targeting existing customers' information rather than computer-generated tables or lists of individuals to be called: *Panzarella*, 37 F.4th at 881–882.

59. Plaintiff is ignorant of the exact process by which the system(s) used by Defendants operates other than by drawing the reasonable inference and alleging that the system(s) stores or produces telephone numbers randomly or possibly sequentially based on the facts ascertainable from the calls Plaintiff received, as outlined above. Indeed, as at least one district court explained, "The newly clarified definition of an ATDS is more relevant to a summary judgment motion than at the pleading stage": *Gross v. GG Homes, Inc.*, No. 3:21-cv-00271-DMS-BGS, 2021 WL 2863623, at *7 (S.D. Cal. July 8, 2021); accord *Miles v. Medicredit, Inc.*, No. 4:20-cv-01186-JAR, 2021 WL 2949565 (E.D. Mo. July 14, 2021).

## Defendants' Conduct Was Knowing and Willing

60. Defendants intentionally called Plaintiff multiple times in order to advertise their services to Plaintiff.

61. Defendants purposefully provided multiple different fictitious names for their business in order to conceal the identity of their company, demonstrating their prior knowledge illegality of the pre-recorded call.

62. Defendants knew their actions were in violation of the TCPA and willfully continued their conduct calling.

## Aminov's Personal Liability

63. Defendant Aminov personally participated in the calls at issue because Aminov personally directed the calls to be transmitted throughout the United States including numbers with Arizona area codes of which he knew were likely to belong to individuals, such as Plaintiff, who reside there.

64. Aminov is the principal officer of Defendant Blackrock.

65. Aminov closely holds Defendant Blackrock and is intimately involved in all decision making and legal activities of Defendant Blackrock.

66. Aminov made the decision to hire agents such as Nika and Kelly, approved of training employees such as Nika and Kelly which included training to provide fictitious names in order to

COMPLAINT- 9

obfuscate the identity of their company, provided and trained on the use of proprietary technology, and directed his employees to use the technology with the intention of breaking federal laws.

67. Defendant Aminov has direct and personal involvement in and ultimate control over every aspect of Defendant Blackrock's wrongful conduct that violated the TCPA, and/or directly controlled and authorized this conduct.

68. Defendant Aminov at all times relevant to this Complaint acting alone or in concert with others, formulated, directed, controlled, had the authority to control, or participated in the acts and practices set forth in this Complaint,

69. There is precedent holding corporate officers personally liable when they participate in the alleged actions: "If the officer directly participated in or authorized the statutory violation, even though acting on behalf of the corporation, he may be personally liable. See United States v Pollution Serv. Of Oswego, Inc., 763 F.2d 133, 134-135 (2nd Cir.1985) The "well-settled" tort rule provides that "when corporate officers directly participate in or authorized the commission of a wrongful act, even if the act is done on behalf of the corporation, they may be personally liable." *General Motos Acceptance Corp. v. Bates*, 954 F.2d 1081, 1085 (5th Cir. 1992). The Fifth Circuit has elaborated that "the thrust of the general [tort] rule is that the officer to be held personally liable must have some direct, personal participation in the tort, as where the defendant was the 'guiding spirit' behind the wrongful conduct….or the 'central figure' in the challenged corporate activity." *Mozingo v. Correct Mfg. Corp.*, 752 F.2d 168, 174 (5th Cirt. 1985) (Citing *Escude Cruz v. Ortho Pharmaceutical Corp.*, 619 F. 2d 902, 907 (1st Cir.1980)) (Citing *Texas v. American Blastfax, Inc.*, 164 F. Supp. 2d 892 (W.D. Tex. 2001) Quoting *Texas v. American Blastfax*: The Court finds the above principles applicable to the TCPA that is, an officer may be personally liable under the TCPA if he had direct, personal participation in or personally authorized the conduct found to have violated the statute, and was not merely tangentially involved. Individuals who directly (and here, knowingly and willfully) violate the TCPA should not escape liability solely because they are corporate officers. As the State persuasive argues, to hold otherwise would allow the individual defendants to simply dissolve Blastfax, set-up a new shell corporation, and repeat their conduct. Congress surely did not intend to permit such a result in passing the TCPA. To be clear, the Court finds Greg and Michael

COMPLAINT- 10

Horne were the "guiding spirits" an the "central figures" behind the TCPA violations. They were the two persons who controlled all of Blastfax's day-to-day operations. They both had direct, personal involvement in and ultimate control over every aspect of Blastfax's wrongful conduct that violate the TCPA, and/or directly controlled and authorized this conduct. And they did so with their eyes and pocketbooks wide open. After October 5, 2000, Greg and Michael Horne had good reason to believe they were running a business that violated the TCPA. On February 9, 2001, they knew they were. Yet they continued to direct their company to send unsolicited intrastate fax advertisements. This is far more than a simple derivative liability case. Accordingly, the Court *899 holds defendants Greg and Michael Horne are jointly and severally liable with Defendant Blastfax, Inc., for all TCPA damages in this lawsuit." *Texas v. American Blastfax, Inc.*, 164 F. Supp. 2d 892 (W.D. Tex. 2001).

70. The Same Court held that corporate officers were also personally liable for DTPA violations; The State contends Greg and Michael Horne are personally liable for any DTPA damages because they were solely responsible for the violating conduct…..For the same reasons discussed in finding the individual defendants personally liable under the TCPA, the Court agrees. See, e.g., *Barclay v. Johnson*, 686 S.W.2d 334, 336-37 (Tex. Civ. App.-Houston [1ST Dist.] 1985, no writ) (finding personal liability for corporate officer in DTPA misrepresentation claim, based on general rule that "a corporate agent knowingly participating in a tortious of fraudulent act may be held individually liable, even though he performed the act as an agent for the corporation……Accordingly, the Court finds defendants American Blastfax, Inc., Greg Horne and Michael Horne are jointly and severally liable for $6,000 in damages for their violations of the DTPA." *Texas v. American Blastfax, Inc.*, 164 F. Supp. 2d 892 (W.D. Tex. 2001).

71. Defendant Aminov is the CEO of Blackrock and controls the day-to-day operations of Blackrock and directs his employees, agents, salespersons, and solicitors to make TCPA-violating phone calls.

72. Defendant Aminov is not merely a bystander. He is the mastermind that schemed, planned, directed, initiated, and controlled illegal and fraudulent behavior.

COMPLAINT- 11

73. Defendant Aminov is well aware their conduct violated the TCPA and refused to alter their behavior. Defendant Aminov is the principal director and officer of Defendant Blackrock and the only person with the power to make unlawful, fraudulent, and unethical behavior stop.

74. Defendant's calls harmed Plaintiff by causing the very harm that Congress sought to prevent—a "nuisance and invasion of privacy.

### Vicarious Liability

75. Defendant Blackrock, through their authorized representatives, Nika and Kelly, made auto-dialed robocalls to Plaintiff.

76. Nika and Kelly used utilized software provided by Blackrock.

77. Nika and Kelly used proprietary information and systems provided by Defendant Blackrock.

78. Blackrock authorized Nika and Kelly to make the phone calls at issue here.

79. Blackrock was aware of the phone calls being made by Nika and Kelly and accepted referrals from Nika and Kelly pursuant to the authorization provided to Nika and Kelly by Blackrock.

80. Blackrock gave access to their proprietary systems and software to Nika and Kelly.

81. Blackrock hired an offshore telemarketer to make phone calls on their behalf. Nika and Kelly is the agent of Blackrock and the offshore telemarketer is the subagent of Blackrock.

82. The offshore telemarketer made the phone calls at the direction and control of Blackrock.

83. Blackrock exercised interim control over whom and under what conditions referrals would be accepted.

84. Blackrock has been aware of the TCPA-violating phone calls made by salespersons for years and has ratified the behavior by maintaining the salespeople responsible for the violations and continuing to accept referrals despite the knowledge of the violations.

85. Aminov has made telemarketing in violation of the TCPA a regular source of referrals.

86. A defendant may be held vicariously liable for Telephone Consumer Protection Act (TCPA) violations where the plaintiff establishes an agency relationship, as defined by federal

COMPLAINT- 12

common law, between the defendant and a third-party caller. Telephone Consumer Protection Act of 1991, § 3(a), 47 U.S.C.A. § 227(b)(2). *Gomez v. Campbell-Ewald Co.*, 768 F.3d 872, 11 (9th Cir. 2014).

### Ratification

87. Blackrock was fully aware of Plaintiff's desire to not be called and solicited for their services.

88. Defendant Blackrock was consciously calling Plaintiff's with full awareness the phone calls were violating the TCPA.

89. Defendant Blackrock was consciously calling Plaintiff's with full awareness the they did not maintain an internal do not call policy as required by the TCPA and that Plaintiff had requested it.

90. Defendant Blackrock was consciously calling Plaintiff's with full awareness the they did not place Plaintiff on their internal do not call list as required by the TCPA and that Plaintiff had requested it because they did not maintain one.

91. Even when a party is not directly liable, it may nevertheless be vicariously liable "under federal common law principles of agency for TCPA violations committed by third-party telemarketers." *DISH Network*, 28 FCC Rcd. at 6584. These agency principles include "not only formal agency [or actual authority], but also . . . apparent authority and ratification." *Id.* ; see also *FDS Rest., Inc. v. All Plumbing, Inc.*, 241 A. 3d 222, 238n. 24 (D. C. 2020) (noting that a different provision of the TCPA, 47 U.S.C. § 217, creates vicarious liability for the acts of an agent). The plaintiff must establish the agency relationship between the defendant and the third-party caller to establish vicarious liability. See *Henderson v. United Student Aid Funds, Inc.*, 918 F.3d 1068, 1072-73 (9th Cir. 2019), as amended on denial of reh'g and reh'g en banc (May 6, 2019) (citing *Gomez v. Campbell-Ewald Co.*, 768 F.3d 871, 878 (9th Cir. 2014), aff'd, 577 U.S. 153 (2016), as revised (Feb. 9, 2016)).

### The TCPA Prohibits All Automated Calls to Protected Numbers

92. The TCPA makes it unlawful "to make any call (other than a call made for emergency purposes or made with the prior express consent of the called party) using an automated telephone dialing system or an artificial or prerecorded voice … to any telephone number assigned to a …

COMPLAINT- 13

paging service, cellular telephone service, specialized mobile radio service, or other radio common carrier service, or any service for which the party is charged for the call": 47 U.S.C. § 227 (b)(1)(A)(iii).

93. Congress singled out these services for special protection because Congress realized their special importance in terms of consumer privacy (as is the case with cellular phones): *Barr v. Am. Ass'n of Pol. Consultants Inc.*, 140 S. Ct. 2335, 2356, (2020) (Gorsuch, J. & Thomas, concurring in part and dissenting in part).

94. According to findings by the Federal Communications Commission ("FCC"), which is the agency Congress vested with the authority to issue regulations implementing the TCPA, such messages are prohibited because, as Congress found, automated or prerecorded messages are a greater nuisance and invasion of privacy than live ones, are costly, and are inconvenient.

95. The TCPA provides a private cause of action to persons who receive calls in violation of 47 U.S.C. § 227(b)(1)(A). 47 U.S.C. § 227(b)(1)(3).

96. These causes of action apply to users of any of four protected services (pager, cellular, specialized mobile radio [i.e., radio telephony locator beacon or dispatch system], or another radio common carrier service [i.e., ship-to-shore or air-to-ground]), or any service, including residential, VoIP, and landline services, for which the called party is charged: *Lynn, Monarch Recovery Mgmt. Inc.*, 953 F. Supp. 2d 612, 623, (D. Md. 2013).

97. "Non-Emergency pre-recorded voice or autodialed calls to the destinations enumerated in 47 U.S.C. § 227(b)(1)(A) are permissible only with the prior express consent of the called party."

98. U.S.C. § 227(c)(2) states, "No person or entity shall initiate any telephone solicitation to … [a] residential telephone subscriber who has registered his or her telephone number on the National Do-Not-Call Registry of persons who do not wish to receive telephone solicitations that is maintained by the Federal Government" and defines "telephone solicitation" as "the initiation of a telephone call or message for the purpose of encouraging the purchase or rental of, or investment in, property, goods, or services, which is transmitted to any person…": U.S.C. § 227(f)(15).

COMPLAINT- 14

99. The FCC also recognized that "wireless customers are charged for incoming calls whether they pay in advance or after the minutes are used": In re Rules and Regulations Implementing the Tel. Consumer Prot. Act of 1991, CG Docket No. 02-278, Report and Order, 18 FCC Rcd. 14014, 14115, ¶ 165 (2003).

100. In 2013, the FCC required prior express written consent for all autodialed or prerecorded telemarketing calls ("robocalls") to wireless numbers and residential lines. Specifically, it ordered:

> [A] Consumer's written consent to receive telemarketing robocalls must be signed and be sufficient to show that the consumer: (1) received "clear and conspicuous disclosure" of the consequences of providing the requested consent, i.e., that the consumer will receive future calls that deliver prerecorded messages by or on behalf of a specific seller; and (2) having received this information, agrees unambiguously to receive such calls at a telephone number the consumer designates. In addition, the written agreement must be obtained "without requiring, directly or indirectly, that the agreement be executed as a condition of purchasing any good or service."

101. *In the Matter of Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 27 FCC Rcd. 1830, 1844 (2012) (footnotes omitted).

102. 47 C.F.R. § 64.1200 extends 47 U.S.C. § 227 and establishes several delivery restrictions. It states, "No person or entity may … [e]xcept as provided … initiate any telephone call … using an automatic telephone dialing system or an artificial or prerecorded voice."

103. 47 C.F.R. § 64.1200(a)(1) specifically protects the following: "emergency telephone line," "guest room or patient room of a hospital, health care facility, elderly home, or similar establishment," and/or "cellular telephone service." 47 C.F.R. § 64.1200(a)(2) further prohibits entities from "initiat[ing], or caus[ing]to be initiated, any telephone call that includes or introduces an advertisement or constitutes telemarketing, using an automatic telephone dialing system or an artificial or prerecorded voice, to any of the lines or telephone numbers described…"

104. The National Do-Not-Call Registry allows consumers to register their telephone numbers and thereby indicate their desire to not receive telephone solicitations at those numbers: 47 C.F.R. § 64.1200(c)(2).

105. A listing on the Registry "must be honored indefinitely, or until the registration is cancelled by the consumer or the telephone number is removed by the database administrator": *Id.*

COMPLAINT- 15

106. The TCPA and implementing regulations prohibit the initiation of telephone solicitations to residential telephone subscribers whose numbers are on the Registry and provide a private right of action against any entity making those calls or "on whose behalf" such calls are promoted: 47 U.S.C. § 227(c)(5); 47 C.F.R. § 64.1200(c)(2).

107. 47 C.F.R. § 64.1200(d) states, "No person or entity shall initiate any call for telemarketing purposes to a residential telephone subscriber unless such person or entity has instituted procedures for maintaining a list of persons who request not to receive telemarketing calls made by or on behalf of that person or entity." It goes on to establish specific "minimum standards":

>  (1) "Persons or entities making calls for telemarketing purposes must have a written policy, available upon demand…"
>  (2) "[P]ersonnel engaged in any aspect of telemarketing must be informed and trained in the existence and use of the do-not-call list."
>  (3) "If a person or entity making a call for telemarketing purposes … receives a request … not to receive calls from that person or entity, the person or entity must record the request and place the subscriber's name … and telephone number on the do-not-call list at the time the request is made … must honor a residential subscriber's do-not-call request within a reasonable time from the date such request is made."
>  (4) "A person or entity making a call for telemarketing purposes must provide the called party with the name of the individual caller, the name of the person or entity on whose behalf the call is being made, and a telephone number or address at which the person or entity may be contacted."
>  (5) "A person or entity making calls for telemarketing purposes must maintain a record of a consumer's request not to receive further telemarketing calls."

### Claims

### Count One

108. Plaintiff incorporates the foregoing allegations as fully set forth herein.

109. The foregoing acts and omissions of Defendants and/or their affiliates, agents, and/or other persons or entities acting on Defendants' behalf constitute violations of the TCPA, 47 U.S.C. § 227, by sending calls, except for emergency purposes, to Plaintiff's telephone which is assigned to a cellular telephone service using an ATDS.

110. As a result of their unlawful conduct, Defendants invaded Plaintiff's personal privacy, causing Plaintiff to suffer damages and, under 47 U.S.C. § 227(b)(3)(B), entitling him to

COMPLAINT- 16

recover $500 in civil fines for each violation and an injunction requiring Defendants to stop his illegal calling campaign.

111.  Plaintiff is also entitled to and does seek injunctive relief prohibiting Defendants and/or his affiliates, agents, and/or other persons or entities acting on Defendants' behalf from violating the TCPA, 47 U.S.C. § 227, by making calls or sending messages, except for emergency purposes, to any number using an artificial or prerecorded voice in the future.

112.  Plaintiff is entitled to an award up to $1500 in damages for each knowing and willful violations of 47 U.S.C. § 227(b)(3)(B)

113.  Defendants' violations were willful and/or knowing.

### Relief Sought

WHEREFORE, Plaintiff requests the following relief:

A. Injunctive relief prohibiting Defendants from calling telephone numbers using an artificial or prerecorded voice and/or ATDS.

B. Because of Defendants' violations of the TCPA, Plaintiff seeks for himself $500 in damages for each violation or—where such regulations were willfully or knowingly violated—up to $1,500 per violation, pursuant to 47 U.S.C. § 227(b)(3).

C. Such other relief as the Court deems just and proper.

RESPECTFULLY SUBMITTED on this December 29, 2024.

_____
Jason Crews

COMPLAINT- 17