Jason Crews
1515 N Gilbert Rd Ste 107-204
Gilbert, AZ 85234
602-295-1875
Jason.crews@gmail.com
*In propria persona.*

UNITED STATES DISTRICT COURT

FOR THE DISTRICT ARIZONA

PHOENIX DIVISION

Jason Crews,

          Plaintiff,

vs.

Travel Club Enterprises LLC dba Club Travelo,

And

Alexandra Olson

          Defendant[s].

Case No.: 2:25-cv-00024-KML

Complaint for Violations of:

1.    NEGLIGENT VIOLATIONS OF THE TELEPHONE CONSUMER PROTECTION ACT [47 U.S.C. §227 ET SEQ.]

2.    WILLFUL VIOLATIONS OF THE TELEPHONE CONSUMER PROTECTION ACT [47 U.S.C. §227 ET SEQ.]

DEMAND FOR JURY TRIAL

///

COMPLAINT- 1

**COMPLAINT**

**Preliminary Statement**

1. "When it comes to robocalls, you can only call those who, like Blondie, have said, "Call me. Call me on the line." If you call people who haven't opted in, then you face liability under the Telephone Communications Protection Act." *Perrong v. Bradford*, 2024 WL 2133801, at *1 (E.D. Pa. May 13, 2024).

2. Plaintiff Jason Crews ("Plaintiff") brings this action under the Telephone Consumer Protection Act ("TCPA"), 47 U.S.C § 227, a federal statute enacted in response to widespread public outrage about the proliferation of intrusive, nuisance calling practices. See *Mims v. Arrow Fin. Servs., LLC*, 132 S. Ct. 740, 745 (2012).

3. The Defendants in this action, Travel Club Enterprises LLC and Alexandra Olson, orchestrated placing two (2) illegal telemarketing calls using an Automated Telephone Dialing System ("ATDS") to a number assigned to a cellular service which was included on the national Do-Not-Call List.

4. Plaintiff never consented to receive such messages.

**Parties**

5. Plaintiff Jason Crews ("Crews") is and was a resident of Maricopa County, Arizona at all relevant times, and a resident of this District.

6. Defendant Travel Club Enterprises LLC ("TCE"), incorporated in Delaware, doing business as Club Travelo, and is in the business of selling travel club memberships to the public.

7. Defendant Alexandra Olson ("Olson"), a resident of Maricopa County, Arizona, was at all times relevant the owner and manager of TCE who directed and authorized the illegal calls complained of herein.

**Jurisdiction & Venue**

8. The Court has federal question subject matter jurisdiction over these TCPA claims: *Mims v. Arrow Fin. Services, LLC*, 132 S. Ct. 740 (2012).

COMPLAINT- 2

9.  The Court has specific personal jurisdiction over the Defendants because the defendants caused the events complained herein to occur in Arizona out of which the TCPA claims arose, and the defendants had minimum contacts with Arizona to justify assertion by an Arizona court of personal jurisdiction, *Meyers v. Hamilton Corp.*, 693 P.2d 904 (Ariz. 1985). Defendants intentionally called or caused Plaintiff's number to be called by dialing an Arizona area code at least two (2) times within a twelve month period to advertise their services despite Plaintiffs number being listed on the national do not call registry in violation of the TCPA. Additionally TCE and their representatives are licensed to sell insurance by the State of Arizona.

10.  This Court has specific personal jurisdiction over Defendants because Defendants purposefully availed themselves to the State of Arizona and to this District, and there is a sufficient relationship between Defendants' purposeful contacts with Arizona and the litigation. Defendants purposefully sent calls into Arizona despite having no business relationship with Plaintiff.

a. Defendants target Arizona when marketing travel club memberships and regularly conduct business in this District, including telephone solicitation.

b. Defendants purposefully sent phone calls to Plaintiff's Phoenix area phone number with area code 602 to generate leads for Defendant TCE.

c. Defendants Olson directed the calls to be sent into Arizona and purposefully directed that Arizona residents be targeted with the solicitation phone calls.

d. The purposeful calls to Arizona injured Plaintiff in Arizona, creating a causal link among Defendants, the forum, and the litigation exceeding the non-causal affiliation sufficient to support personal specific jurisdiction. See *Ford Motor Co. v Mont*. Eight Jud. Dist. Ct., 141 S. Ct. 1017 (2021).

## Venue

11.  Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(1)-(2) because a substantial part of the events giving rise to the claims—the calls and sale of goods and services directed at Arizona residents, including the Plaintiff—occurred in this District and

**Deleted:** Texas

COMPLAINT- 3

because the Plaintiff resides in this District and because the Plaintiff resides in the District of Arizona when he received a substantial, if not every single phone call, from Defendants TCE and Olson which is the subject matter of this lawsuit.

12. Venue is proper for this matter because the calls at issue were sent by or on behalf of the above-named Defendants to Plaintiff, an Arizona resident.

**The Telephone Consumer Protection Act**

13. In 1991, Congress enacted the TCPA to restrict the use of sophisticated telemarketing equipment that could target millions of consumers en masse. Congress found that these calls were not only a nuisance and an invasion of privacy to consumers specifically but were also a threat to interstate commerce generally. See S. Rep. No. 102-178, at 2-3 (1991), as reprinted in 1991 U.S.C.C.A.N. 1968, 1969-71.

14. The TCPA makes it unlawful "to make any call (other than a call made for emergency purposes or made with the prior express consent of the called party) using an automatic telephone dialing system ('ATDS') or an artificial or prerecorded voice … to any telephone number assigned to a … cellular telephone service." 47 U.S.C. § 227(b)(1)(A)(iii).

15. The TCPA makes it unlawful "to initiate any telephone call to any residential telephone line using an artificial or prerecorded voice to deliver a message without the prior express consent of the called party, unless the call is initiated for emergency purposes, is made solely pursuant to the collection of a debt owed to or guaranteed by the United States or is exempted by rule or order" of the Federal Communication Commission ("FCC"). 47 U.S.C. § 227(b)(1)(B). 15. The TCPA provides a private cause of action to persons who receive calls in violation of § 227(b). 47 U.S.C. § 227(b)(3).

16. Separately, the TCPA bans telemarketing calls without a do-not-call policy available upon demand. 47 U.S.C. § 227(c); 47 C.F.R. § 64.1200(d)(1).1

17. The TCPA provides a private cause of action to persons who receive calls in violation of § 227(c) or a regulation promulgated thereunder. 47 U.S.C. § 227(c)(5).

18. According to findings of the FCC, the agency vested by Congress with authority to issue regulations implementing the TCPA, automated or prerecorded telephone

COMPLAINT- 4

calls are a greater nuisance and invasion of privacy than live solicitation calls and can be costly and inconvenient.

19.    The FCC also recognizes that "wireless customers are charged for incoming calls whether they pay in advance or after the minutes are used." *In re Rules and Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 18 FCC Rcd. 14014, 14115 ¶ 165 (2003).

20.    The FCC requires "prior express written consent" for all autodialed or prerecorded telemarketing robocalls to wireless numbers and residential lines. In particular:[A] consumer's written consent to receive telemarketing robocalls must be signed and be sufficient to show that the consumer: (1) received clear and conspicuous disclosure of the consequences of providing the requested consent, i.e., that the consumer will receive future calls that deliver prerecorded messages by or on behalf of a specific seller; and (2) having received this information, agrees unambiguously to receive such calls at a telephone number the consumer designates. In addition, the written agreement must be obtained without requiring, directly or indirectly, that the agreement be executed as a condition of purchasing any good or service.

21.    *In the Matter of Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 27 FCC Rcd. 1830, 1844 ¶ 33 (2012) (footnote and internal quotation marks omitted). FCC regulations "generally establish that the party on whose behalf a solicitation is made bears ultimate responsibility for any violations." *In the Matter of Rules and Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 10 FCC Rcd. 12391, 12397 ¶ 13 (1995).

22.    The FCC confirmed this principle in 2013, when it explained that "a seller … may be held vicariously liable under federal common law principles of agency for violations of either section 227(b) or section 227(c) that are committed by third-party telemarketers." *In the Matter of the Joint Petition Filed by Dish Network, LLC*, 28 FCC Rcd. 6574, 6574 ¶ 1 (2013).

23.    Under the TCPA, a text message is a call. *Satterfield v. Simon & Schuster, Inc.*, 569 F.3d 946, 951 – 52 (9th Cir. 2009).

COMPLAINT- 5

24. A corporate officer involved in the telemarketing at issue may be personally liable under the TCPA. E.g., *Jackson Five Star Catering, Inc. v. Beason*, Case No. 10-10010, 2013 U.S. Dist. LEXIS 159985, at *10 (E.D. Mich. Nov. 8, 2013) ("[M]any courts have held that corporate actors can be individually liable for violating the TCPA where they had direct, personal participation in or personally authorized the conduct found to have violated the statute." (internal quotation marks omitted)); *Maryland v. Universal Elections*, 787 F. Supp. 2d 408, 415 – 16 (D. Md. 2011) ("If an individual acting on behalf of a corporation could avoid individual liability, the TCPA would lose much of its force.").

<u>**Factual Allegations**</u>

25. To promote their services Defendants also relied on the use of ATDS systems.

26. Plaintiff had no prior business relationship with Defendants.

27. Plaintiff is a "person" as defined by 47 U.S.C. § 153(39).

28. Defendant Olson is a "person" as defined by 47 U.S.C. § 153(39).

29. Defendant TCE is a "person" as defined by 47 U.S.C. § 153(39).

30. The phone number (602) 295-XXXX ("Cell Number") belongs to Plaintiff.

31. The Cell Number has been on the Do-Not-Call registry since November 7, 2006.

32. Despite this registration, Defendants placed the calls summarized in the following table with an Automated Telephone Dialing Systems ("ATDS").

| Date | Time | Caller ID |
|------|------|-----------|
| 7/26/24 | 12:05 PM | (731)451-0779 |
| 11/6/24 | 12:34 PM | (602)903-4467 |
| 1/6/25 | 9:17 AM | (602)996-8364 |

33. The Cell Number is assigned to a cellular phone used exclusively for personal residential purposes.

34. Plaintiff did not consent to receive telephone calls via ATDS.

35. The Cell Number is not associated with a business.

/ / /

COMPLAINT- 6

Calls to Plaintiff

36.   On or about July 7, 2024, Plaintiff received a call presenting caller ID (731)451-0779.

37.   Plaintiff was greeted by an individual who identified himself as Luis Martinez ("Martinez").

38.   Martinez invited Plaintiff "to be one of our guests to the Grand Open House Celebration of our newest Travel Reservation Center located here in Scottsdale, Arizona."

39.   Martinez said he was calling on behalf of Club Travelo.

40.   On or about July 26, 2024, Plaintiff received a call presenting caller ID (731)451-0779.

41.   Plaintiff was greeted by an individual who identified themselves as Luis Martinez ("Martinez").

42.   Martinez claimed to be calling from United Airlines and offered "guests to [attend] the Grand Open House Celebration of our newest Travel Reservation Center located here in Scottsdale, Arizona.".

43.   Upon information and belief the purpose of this invitation was to further solicit Plaintiff into purchasing a membership to their "Travel Club".

44.   Martinez transferred Plaintiff to another individual who identified themselves as Camille.

45.   Camille continued to pressure Plaintiff into attending "agency promotion that will happen here in in Scottsdale."

46.   Plaintiff asked Camille "So what you guys do as your travel agency, you want me to like, you're trying to get me to buy travel?"  To which she replied, "yes, sir".

47.   Plaintiff asked Camille for the name of her company and she said "Preview Center".

48.   Plaintiff was unable to locate any information about "Preview Center" in Scottsdale, and asked Camille for more information.

49.   Camille eventually said the name of her company was Club Travello.

COMPLAINT- 7

Formatted: Font: (Default) Garamond, 13 pt

50.   On November 6, 2024, Plaintiff received a second call from an individual following a very similar script to the July 26 phone call.

51.   The caller said they were calling on behalf of Club Travello.

52.   On or about January 6, 2025, Plaintiff received a third call which followed a similar script to the prior two calls advertising similar products which lead him to belive the call was placed on behalf of Club Travello.

53.   On or about February 6, 2025, A representative from Club Travelo emailed Plaintiff admitting "[the calls] were likely made by a vendor…"

**Defendants' Use of an ATDS**

54.   TCE's called from various different numbers with different area codes.

55.   TCE's representatives used the identical or nearly identical scripts.

56.   TCE's representatives purposefully attempted to conceal the identity of their company, initially claiming to represent American Airlines.

57.   When calling back the numbers presented by the caller ID's Plaintiff the numbers were disconnected.

58.   TCE's representatives solicited services did not target Plaintiff individually but rather utilized generic scripts which never identified Plaintiff by name.

59.   For these reasons, Plaintiff believes the telemarketers used an ATDS to generate leads for Defendant's debt relief services.

60.   The calls were conducted using an Automatic Telephone Dialing System (ATDS). As the Supreme Court recently clarified, the key feature of an ATDS is the capacity to store numbers to be called using a random or sequential number generator or to produce numbers to be called using a random or sequential number generator: *Facebook, Inc. v. Duguid*, 141 S. Ct. 1163, 1167 (2021).

61.   The Third Circuit recently clarified that "Congress envisioned a broad understanding of 'equipment'" that constitutes an ATDS. It also clarified that the analysis of whether an ATDS was used in violation of the TCPA centers around "whether the

COMPLAINT- 8

Defendants employ[s] [ATDS] capacities to make automated calls": *Panzarella v. Navient Sols., Inc.*, 37 F.4th 867, 873, 878 (3d Cir. 2022). In so doing, it held that Congress intended to "ban all autodialed calls" because Congress "found autodialer technology to be uniquely harmful": Id. at 879 (cleaned up).

62.    In enacting the ATDS prohibition, the Third Circuit cited favorably to Congressional understanding "that telemarketers could transform ordinary computers into autodialers through minor and inexpensive modifications," including by "relying on computerized databases containing telephone numbers during their dialing campaigns": Id. at 880 (cleaned up). The Third Circuit held that, in passing the TCPA's ATDS prohibition, Congress intended to remedy the problems caused by callers using computer software to dial numbers randomly or sequentially from a list or database: *Id.*

63.    The system(s) that Defendants used to place the calls to Plaintiff is/are an ATDS because it would be illogical to dial a number manually, have Plaintiff answer the phone, and only then connect Plaintiff to a human being.

64.    Audible pauses, clicks, and beeps are hallmark indicia of ATDS systems. This supports the inference that Defendants used an ATDS, such as one that "use[s] a random [or sequential] number generator to determine the order in which to pick phone numbers from a pre-produced list": *Facebook*, 141 S. Ct. at 1171 n.7.

65.    Other courts have held, post-Facebook, that allegations similar to those herein of the absence of a relationship between the parties, and the random nature of the automation device (such as the ability to randomly generate caller ID numbers), are all indicia of use of a random or sequential dialing device. This gives rise to the inference at the pleadings stage that an ATDS was used to make the calls: *Camunas v. Nat'l Republican Senatorial Comm.*, No. 21-1005, 2021 U.S. Dist. LEXIS 100125 at *11 (E.D. Pa. May 26, 2021).

66.    No facts exist here to support the conclusion that Defendants was calling from a curated list of his past customers. In contrast to a company that dials calls en masse to multiple individuals from a list of telephone numbers (as here), a company that calls its

COMPLAINT- 9

existing customers utilizing an imported customer list does not place calls using an ATDS. Such calling uses a database targeting existing customers' information rather than computer-generated tables or lists of individuals to be called: *Panzarella*, 37 F.4th at 881–882.

67.  Plaintiff is ignorant of the exact process by which the system(s) used by Defendants operates other than by drawing the reasonable inference and alleging that the system(s) stores or produces telephone numbers randomly or possibly sequentially based on the facts ascertainable from the calls Plaintiff received, as outlined above. Indeed, as at least one district court explained, "The newly clarified definition of an ATDS is more relevant to a summary judgment motion than at the pleading stage": *Gross v. GG Homes, Inc.*, No. 3:21-cv-00271-DMS-BGS, 2021 WL 2863623, at *7 (S.D. Cal. July 8, 2021); accord *Miles v. Medicredit, Inc.*, No. 4:20-cv- 01186-JAR, 2021 WL 2949565 (E.D. Mo. July 14, 2021).

### Defendants' Conduct Was Knowing and Willing

68.  Defendants intentionally called Plaintiff multiple times in order to advertise their services to Plaintiff.

69.  These calls were knowingly and intentionally made in spite of Plaintiff's number decades-long listing on the National Do-Not-Call List.

### Olson's Personal Liability

70.  Defendant Olson personally participated in the calls at issue because Olson personally directed the calls to be transmitted throughout the United States including numbers with Arizona area codes of which he knew were likely to belong to individuals, such as Plaintiff, who reside there.

71.  Olson is the principal officer of Defendant TCE.

72.  Olson closely holds Defendant TCE and is intimately involved in all decision-making and legal activities of Defendant TCE.

73.  Olson made the decision to hire agents such as Martinez, approved of training employees such as Martinez on the use of proprietary technology, and directed his employees to use the technology with the intention of breaking state and federal laws.

COMPLAINT- 10

74.    Defendant Olson has direct and personal involvement in and ultimate control over every aspect of Defendant TCE's wrongful conduct that violated the TCPA, and/or directly controlled and authorized this conduct.

75.    Defendant Olson at all times relevant to this Complaint acting alone or in concert with others, formulated, directed, controlled, had the authority to control, or participated in the acts and practices set forth in this Complaint,

76.    There is precedent holding corporate officers personally liable when they participate in the alleged actions: "If the officer directly participated in or authorized the statutory violation, even though acting on behalf of the corporation, he may be personally liable. See *United States v Pollution Serv. Of Oswego, Inc.*, 763 F.2d 133, 134-135 (2nd Cir.1985) The "well-settled" tort rule provides that "when corporate officers directly participate in or authorized the commission of a wrongful act, even if the act is done on behalf of the corporation, they may be personally liable." *General Motos Acceptance Corp. v. Bates*, 954 F.2d 1081, 1085 (5th Cir. 1992). The Fifth Circuit has elaborated that "the thrust of the general [tort] rule is that the officer to be held personally liable must have some direct, personal participation in the tort, as where the defendant was the 'guiding spirit' behind the wrongful conduct….or the 'central figure' in the challenged corporate activity." *Mozingo v. Correct Mfg. Corp.*, 752 F.2d 168, 174 (5th Cirt. 1985) (Citing *Escude Cruz v. Ortho Pharmaceutical Corp.*, 619 F. 2d 902, 907 (1st Cir.1980)) (Citing *Texas v. American Blastfax, Inc.*, 164 F. Supp. 2d 892 (W.D. Tex. 2001) Quoting *Texas v. American Blastfax*: The Court finds the above principles applicable to the TCPA that is, an officer may be personally liable under the TCPA if he had direct, personal participation in or personally authorized the conduct found to have violated the statute, and was not merely tangentially involved. Individuals who directly (and here, knowingly and willfully) violate the TCPA should not escape liability solely because they are corporate officers. As the State persuasive argues, to hold otherwise would allow the individual defendants to simply dissolve Blastfax, set-up a new shell corporation, and repeat their conduct. Congress surely did not intend to permit such a result in passing the TCPA. To be clear, the Court finds Greg and Michael Horne were the "guiding spirits" an the

COMPLAINT- 11

"central figures" behind the TCPA violations. They were the two persons who controlled all of Blastfax's day-to-day operations. They both had direct, personal involvement in and ultimate control over every aspect of Blastfax's wrongful conduct that violate the TCPA, and/or directly controlled and authorized this conduct. And they did so with their eyes and pocketbooks wide open. After October 5, 2000, Greg and Michael Horne had good reason to believe they were running a business that violated the TCPA. On February 9, 2001, they knew they were. Yet they continued to direct their company to send unsolicited intrastate fax advertisements. This is far more than a simple derivative liability case. Accordingly, the Court *899 holds defendants Greg and Michael Horne are jointly and severally liable with Defendant Blastfax, Inc., for all TCPA damages in this lawsuit." *Texas v. American Blastfax, Inc.*, 164 F. Supp. 2d 892 (W.D. Tex. 2001).

77.  The Same Court held that corporate officers were also personally liable for DTPA violations; The State contends Greg and Michael Horne are personally liable for any DTPA damages because they were solely responsible for the violating conduct…..For the same reasons discussed in finding the individual defendants personally liable under the TCPA, the Court agrees. See, e.g., *Barclay v. Johnson,* 686 S.W.2d 334, 336-37 (Tex. Civ. App.-Houston [1ST Dist.] 1985, no writ) (finding personal liability for corporate officer in DTPA misrepresentation claim, based on general rule that "a corporate agent knowingly participating in a tortious of fraudulent act may be held individually liable, even though he performed the act as an agent for the corporation……Accordingly, the Court finds defendants American Blastfax, Inc., Greg Horne and Michael Horne are jointly and severally liable for $6,000 in damages for their violations of the DTPA." *Texas v. American Blastfax, Inc.,* 164 F. Supp. 2d 892 (W.D. Tex. 2001).

78.  Defendant Olson is the CEO of TCE and controls the day-to-day operations of TCE and directs his employees, agents, salespersons, and solicitors to make TCPA-violating phone calls.

79.  Defendant Olson is not merely a bystander. He is the mastermind that schemed, planned, directed, initiated, and controlled illegal and fraudulent behavior.

COMPLAINT- 12

80.    Defendant Olson is well aware their conduct violated the TCPA and refused to alter their behavior. Defendant Olson is the principal director and officer of Defendant TCE and the only person with the power to make unlawful, fraudulent, and unethical behavior stop.

81.    Defendant's calls harmed Plaintiff by causing the very harm that Congress sought to prevent—a nuisance and invasion of privacy.

**Vicarious Liability**

82.    Defendant TCE through their authorized representative Martinez made multiple auto-dialed robocalls to Plaintiff.

83.    Martinez used utilized software provided by TCE.

84.    Martinez used proprietary information and systems provided by Defendant TCE.

85.    TCE authorized Martinez to make the phone calls at issue here.

86.    TCE was aware of the phone calls being made by Martinez and accepted referrals from Martinez pursuant to the authorization provided to Martinez by TCE.

87.    TCE gave access to their proprietary systems and software to Defendant Martinez.

88.    TCE hired an offshore telemarketer to make phone calls on their behalf. Martinez is the agent of TCE and the offshore telemarketer is the subagent of TCE.

89.    The offshore telemarketer made the phone calls at the direction and control of TCE.

90.    TCE exercised interim control over whom and under what conditions referrals would be accepted.

91.    TCE has been aware of the TCPA-violating phone calls made by salespersons for years and has ratified the behavior by maintaining the salespeople responsible for the violations and continuing to accept referrals despite the knowledge of the violations.

92.    Olson has made telemarketing in violation of the TCPA a regular source of referrals in multiple organizations in which he is associated.

COMPLAINT- 13

93.    A defendant may be held vicariously liable for Telephone Consumer Protection Act (TCPA) violations where the plaintiff establishes an agency relationship, as defined by federal common law, between the defendant and a third-party caller. Telephone Consumer Protection Act of 1991, § 3(a), 47 U.S.C.A. § 227(b)(2). *Gomez v. Campbell-Ewald Co.*, 768 F.3d 872, 11 (9th Cir. 2014).

**The TCPA Prohibits All Automated Calls to Protected Numbers**

94.    The TCPA makes it unlawful "to make any call (other than a call made for emergency purposes or made with the prior express consent of the called party) using an automated telephone dialing system or an artificial or prerecorded voice … to any telephone number assigned to a … paging service, cellular telephone service, specialized mobile radio service, or other radio common carrier service, or any service for which the party is charged for the call": 47 U.S.C. § 227 (b)(1)(A)(iii).

95.    Congress singled out these services for special protection because Congress realized their special importance in terms of consumer privacy (as is the case with cellular phones): *Barr v. Am. Ass'n of Pol. Consultants Inc.*, 140 S. Ct. 2335, 2356, (2020) (Gorsuch, J. & Thomas, concurring in part and dissenting in part).

96.    According to findings by the Federal Communications Commission ("FCC"), which is the agency Congress vested with the authority to issue regulations implementing the TCPA, such messages are prohibited because, as Congress found, automated or prerecorded messages are a greater nuisance and invasion of privacy than live ones, are costly, and are inconvenient.

97.    The TCPA provides a private cause of action to persons who receive calls in violation of 47 U.S.C. § 227(b)(1)(A). 47 U.S.C. § 227(b)(1)(3).

98.    These causes of action apply to users of any of four protected services (pager, cellular, specialized mobile radio [i.e., radio telephony locator beacon or dispatch system], or another radio common carrier service [i.e., ship-to-shore or air-to-ground]), or any service, including residential, VoIP, and landline services, for which the called party is charged: *Lynn, Monarch Recovery Mgmt. Inc.*, 953 F. Supp. 2d 612, 623, (D. Md. 2013).

COMPLAINT- 14

99.   "Non-Emergency pre-recorded voice or autodialed calls to the destinations enumerated in 47 U.S.C. § 227(b)(1)(A) are permissible only with the prior express consent of the called party."

100.  U.S.C. § 227(c)(2) states, "No person or entity shall initiate any telephone solicitation to … [a] residential telephone subscriber who has registered his or her telephone number on the National Do-Not-Call Registry of persons who do not wish to receive telephone solicitations that is maintained by the Federal Government" and defines "telephone solicitation" as "the initiation of a telephone call or message for the purpose of encouraging the purchase or rental of, or investment in, property, goods, or services, which is transmitted to any person…": U.S.C. § 227(f)(15).

101.  The FCC also recognized that "wireless customers are charged for incoming calls whether they pay in advance or after the minutes are used": In re Rules and Regulations Implementing the Tel. Consumer Prot. Act of 1991, CG Docket No. 02-278, Report and Order, 18 FCC Rcd. 14014, 14115, ¶ 165 (2003).

102.  In 2013, the FCC required prior express written consent for all autodialed or prerecorded telemarketing calls ("robocalls") to wireless numbers and residential lines. Specifically, it ordered:

> [A] Consumer's written consent to receive telemarketing robocalls must be signed and be sufficient to show that the consumer: (1) received "clear and conspicuous disclosure" of the consequences of providing the requested consent, i.e., that the consumer will receive future calls that deliver prerecorded messages by or on behalf of a specific seller; and (2) having received this information, agrees unambiguously to receive such calls at a telephone number the consumer designates. In addition, the written agreement must be obtained "without requiring, directly or indirectly, that the agreement be executed as a condition of purchasing any good or service."

103. *In the Matter of Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991,* 27 FCC Rcd. 1830, 1844 (2012) (footnotes omitted).

104. 47 C.F.R. § 64.1200 extends 47 U.S.C. § 227 and establishes several delivery restrictions. It states, "No person or entity may … [e]xcept as provided … initiate any

COMPLAINT- 15

telephone call … using an automatic telephone dialing system or an artificial or prerecorded

voice."

105. 47 C.F.R. § 64.1200(a)(1) specifically protects the following: "emergency

telephone line," "guest room or patient room of a hospital, health care facility, elderly

home, or similar establishment," and/or "cellular telephone service." 47 C.F.R. §

64.1200(a)(2) further prohibits entities from "initiat[ing], or caus[ing]to be initiated, any

telephone call that includes or introduces an advertisement or constitutes telemarketing,

using an automatic telephone dialing system or an artificial or prerecorded voice, to any of

the lines or telephone numbers described… "

106. The National Do-Not-Call Registry allows consumers to register their telephone

numbers and thereby indicate their desire to not receive telephone solicitations at those

numbers: 47 C.F.R. § 64.1200(c)(2).

107. A listing on the Registry "must be honored indefinitely, or until the registration

is cancelled by the consumer or the telephone number is removed by the database

administrator": *Id.*

108. The TCPA and implementing regulations prohibit the initiation of telephone

solicitations to residential telephone subscribers whose numbers are on the Registry and

provide a private right of action against any entity making those calls or "on whose behalf"

such calls are promoted: 47 U.S.C. § 227(c)(5); 47 C.F.R. § 64.1200(c)(2).

109. 47 C.F.R. § 64.1200(d) states, "No person or entity shall initiate any call for

telemarketing purposes to a residential telephone subscriber unless such person or entity

has instituted procedures for maintaining a list of persons who request not to receive

telemarketing calls made by or on behalf of that person or entity." It goes on to establish

specific "minimum standards":

> (1) "Persons or entities making calls for telemarketing purposes must have a
> written policy, available upon demand…"
> (2) "[P]ersonnel engaged in any aspect of telemarketing must be informed and
> trained in the existence and use of the do-not-call list."
> (3) "If a person or entity making a call for telemarketing purposes … receives a
> request … not to receive calls from that person or entity, the person or entity

COMPLAINT- 16

must record the request and place the subscriber's name … and telephone number on the do-not-call list at the time the request is made … must honor a residential subscriber's do-not-call request within a reasonable time from the date such request is made."

(4) "A person or entity making a call for telemarketing purposes must provide the called party with the name of the individual caller, the name of the person or entity on whose behalf the call is being made, and a telephone number or address at which the person or entity may be contacted."

(5) "A person or entity making calls for telemarketing purposes must maintain a record of a consumer's request not to receive further telemarketing calls."

///

## Claims

### Count One

110.    Plaintiff incorporates the foregoing allegations as fully set forth herein.

111.    The foregoing acts and omissions of Defendants and/or their affiliates, agents, and/or other persons or entities acting on Defendants' behalf constitute violations of the TCPA, 47 U.S.C. § 227, by sending calls, except for emergency purposes, to Plaintiff's telephone which is assigned to a cellular telephone service using an ATDS.

112.    As a result of their unlawful conduct, Defendants invaded Plaintiff's personal privacy, causing Plaintiff to suffer damages and, under 47 U.S.C. § 227(b)(3)(B), entitling him to recover $500 in civil fines for each violation and an injunction requiring Defendants to stop his illegal calling campaign.

113.    Plaintiff is also entitled to and does seek injunctive relief prohibiting Defendants and/or his affiliates, agents, and/or other persons or entities acting on Defendants' behalf from violating the TCPA, 47 U.S.C. § 227, by making calls or sending messages, except for emergency purposes, to any number using an artificial or prerecorded voice in the future.

114.    Plaintiff is entitled to an award up to $1500 in damages for each knowing and willful violations of 47 U.S.C. § 227(b)(3)(B)

115.    Defendants' violations were willful and/or knowing.

COMPLAINT- 17

**Count Two**

116.    Plaintiff incorporates the foregoing allegations as fully set forth herein.

117.    Defendants called Plaintiff's private residential telephone number, which was registered on the National Do-Not-Call Registry more than thirty-one (31) days prior to the calls, in violation of 47 U.S.C. § 227(c)(3)(F) and 47 C.F.R. § 64.1200(c)(2).

118.    As a result of their unlawful conduct, Defendants invaded Plaintiff's personal privacy, causing Plaintiff to suffer damages and, under 47 U.S.C. § 227(c)(3)(F) entitling him to recover $500 in civil fines for each violation and an injunction requiring Defendants to stop his illegal calling campaign.

119.    Plaintiff is entitled to an award up to $1500 in damages for each knowing and willful violation of 47 U.S.C. § 227(c)(3)(F).

120.    Defendants' violations were willful and/or knowing.

**Relief Sought**

WHEREFORE, Plaintiff requests the following relief:

A. Injunctive relief prohibiting Defendants from calling telephone numbers using an artificial or prerecorded voice and/or ATDS.

B. Because of Defendants' violations of the TCPA, Plaintiff seeks for himself $500 in damages for each violation or—where such regulations were willfully or knowingly violated—up to $1,500 per violation, pursuant to 47 U.S.C. § 227(b)(3).

C. Because of Defendants' violations of the TCPA, Plaintiff seeks for himself $500 in damages for each violation or—where such regulations were willfully or knowingly violated—up to $1,500 per violation, pursuant to 47 U.S.C. § 227(c)(3).

D. Because of Defendants' violations of the FTSA, Plaintiff seeks for himself $500 in damages for each violation or—where such regulations were willfully or knowingly violated—up to $1,500 per violation, pursuant to Fla. Stat. § 501.059.

E. Such other relief as the Court deems just and proper.

COMPLAINT- 18

RESPECTFULLY SUBMITTED on this March 23, 2025.

_____

Jason Crews

COMPLAINT- 19